**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | | |
|---|---|---|
| ROBERT DRAKEFORD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:03cv1201-WHA |
| | ) | (WO) |
| | ) | |
| ALABAMA COOPERATIVE | ) | |
| EXTENSION SYSTEM, | ) | |
| WILLIAM WALKER, and GAINS SMITH,) | | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

**I. INTRODUCTION**

This case is before the court on a Motion for Summary Judgment (Doc #49) filed by

Defendants, the Alabama Cooperative Extension System, Dr. William Walker, and Dr. Gaines

Smith (hereinafter collectively "ACES") on July 29, 2005.

The Plaintiff, Dr. Robert Drakeford, filed an EEOC charge on May 1, 2002 against his

employer, ACES, alleging racial discrimination.  On February 13, 2003, Dr. Drakeford

supplemented his EEOC charge, alleging continued discrimination at ACES.  He received a

"Right to Sue" letter from the EEOC on September 3, 2003, and on December 8, 2003 he filed

his initial complaint before this court.  Plaintiff filed a separate EEOC complaint in October

2003, alleging discrimination and retaliation against him by ACES.  He received a "Right to

Sue" letter on March 18, 2004.  He amended his complaint on June 14, 2004, to include the new

allegations.  In his complaint,  Plaintiff brings claims under Title VII of the Civil Rights Act of

1964, 42 U.S.C. § 2000e, et seq., as amended by the Civil Rights Act of 1991,  for discrimination

on the basis of race and retaliation,  and for deprivation of equal protection rights pursuant to 42 U.S.C. §§ 1983 and 1981.

For the reasons to be discussed, the Motion for Summary Judgment is due to be GRANTED.

## II.  JURISDICTION AND VENUE

Based upon 28 U.S.C. §§ 1331 and 1343, the court properly exercises subject matter jurisdiction over this action.  The parties do not contest personal jurisdiction or venue. Furthermore, the court finds that the Plaintiff has fulfilled the two jurisdictional prerequisites for instituting a Title VII lawsuit.  Plaintiff has timely filed a charge with the Equal Employment Opportunity Commission ("EEOC"), wherein he asserted claims of racial discrimination and retaliation.  After receiving right to sue letters from the EEOC, Plaintiff seasonably filed this action.  See McDonnell Douglas Corp v. Green, 411 U.S. 792, 798 (1973).


## III.  SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."
Id. at 323.  The movant can meet this burden by presenting evidence showing there is no dispute
of material fact, or by showing, or pointing out to, the district court that the nonmoving party has
failed to present evidence in support of some element of its case on which it bears the ultimate
burden of proof.  Id. at 322-324.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to
go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to
interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine
issue for trial.'"  Id. at 324.  To avoid summary judgment, the nonmoving party "must do more
than show that there is some metaphysical doubt as to the material facts."  Matsushita Elec.
Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  On the other hand, the evidence of
the nonmovant must be believed and all justifiable inferences must be drawn in its favor.  See
Anderson v. Liberty Lobby, 477 U.S. 242, 255 (1986).  After the nonmoving party has
responded to the motion for summary judgment, the court must grant summary judgment if there
is no genuine issue of material fact and the moving party is entitled to judgment as a matter of
law. FED. R. CIV. P. 56(c).

The summary judgment rule is to be applied in employment discrimination cases as in
any other case.  Chapman v. AI Transport, 229 F.3d 1012, 1026 (11th Cir. 2000) (en banc).

## IV. FACTS

The submissions of the parties establish the following facts, construed in a light most
favorable to the non-movant.

ACES is the primary outreach organization for the land-grant mission of Auburn University and Alabama A&M University.   ACES has over 500 agents and field-based staff members spread out across Alabama, running research-based educational programs in Agriculture, Forestry and Natural Resources, Family and Well-Being, Community and Economic Development, and 4-H and Youth Development.  The organizational hierarchy is straight forward.  At the top is the Director of ACES, or in this case, the Interim Director, Dr. Gaines Smith.  Below the Director are two Associate Directors, the Associate Director for Urban and New Nontraditional Programs (ADUNNP) and the Associate Director for Rural and Traditional Programs (ADRTP).  Below the Associate Directors are several Assistant Directors who are responsible for different state-wide programs, and below the Assistant Directors are the various staff, specialists, and field personnel assigned to carry out the ACES mission.

The Plaintiff, Dr. Robert Drakeford, is an African American man who was first hired by ACES in 1993.  His initial job title was that of "Extension Specialist for Volunteer Programs" working within the 4-H program.  His job title was later changed to "Extension Specialist/Coordinator of Volunteer and After-School Programs."  Specialists at ACES are charged with using their specialized knowledge to design programs in their particular area of expertise and to serve as a resource for field staff.  As an Extension Specialist, Dr. Drakeford has reported directly to the Assistant Director in charge of the 4-H and Youth Development Program. Before coming to ACES, Dr. Drakeford worked for four years in the North Carolina Extension System as an "Extension Agent" within the 4-H & Youth program.  He has also held a diverse array of non-extension positions.  He served as the General Manager of two small companies, worked for the North Carolina Department of Human Resources, and also worked

4

for a Community College as a federal grant project director.  Additionally, he was the mayor of a small town in North Carolina.  He has a Bachelor of Science degree from Quinnipiac College, a Masters in Public Health from the University of North Carolina at Chapel Hill, and a PhD. in Education from the University of North Carolina at Greensboro.

## A.  Overview of the Facts

Dr. Drakeford applied for two senior level positions within ACES and did not receive either.  He first responded to an opening for the Associate Director, Rural and Traditional Programs (ADRTP) and did not receive an interview.  He alleged that there was discrimination in the search and hiring process for the ADRTP position and filed a complaint under the Program for Equal Employment Opportunity in the Alabama Cooperative Extension System.  He received an EEO hearing which he also claimed was discriminatory.  The EEO hearing officer found procedural irregularities but no discrimination.  After the hearing, Dr. Drakeford was given an interview for the ADRTP position, which he has called a "sham" interview.  After his interview, the ADRTP position was given to another candidate, who is white.  He next filed a charge of racial discrimination with the EEOC.  While that charge was pending, the position of Assistant Director, 4-H and Youth Development (AD4-H) opened and he applied.  This time he received an interview, but again was not offered the job.  He amended his earlier EEOC complaint, alleging that he was discriminated against during the  search process and hiring decision for the AD4-H job.  Dr. Drakeford also alleges that not getting the AD4-H job was part of a pattern of retaliation he has been forced to endure since filing his EEOC complaints.  In the complaint before this court he alleges that the search process and hiring decision for both jobs was tainted with racial discrimination and he also alleges several instances of retaliation.

**B.  Facts surrounding the ADRTP position**

The search for a new ADRTP, one of the two top positions under the Director, began on September 21, 2001.  ACES' Associate Director for Human Resources, Barbara Duncan, was in charge of conducting the search.  She published a vacancy announcement that was sent to Extension systems throughout the nation and published in two education periodicals with nation-wide circulation.  A separate announcement was posted on the internet.  The "hard copy" announcement listed the deadline for applications as "October 12, 2001," while the internet copy listed the deadline as "October 12, 2001 or until qualified applicant is found."  Dr. Drakeford submitted his application on October 23, 2001 and it was initially rejected by Duncan for being late.  Duncan also rejected another application that was received after October 12, 2001, but before the first committee meeting.  Dr. Drakeford complained to Dr. Smith that his application was on-time, according to the "until qualified applicant is found" language in the internet announcement.  Dr. Smith agreed and allowed his application to go forward.

When the applications were considered complete, they were copied and forwarded to the search committee that Duncan had formed.[1]  For a file to be considered complete, a minimum of

---

[1]The ADRTP search committee was comprised of the following individuals: Barbara Duncan, chair of the committee (votes only to break a tie); Beth Atkins-Lawrence, Assistant Director for Development; Valerie Connor, Autauga County Extension Coordinator; Julio Correa, Extension Animal Dairy Specialist; Tommy Elliot, Extension CFO; Richard Feuerriegel, Extension Information Technology Specialist; Wayne Ford, Tuscaloosa County Extension Coordinator; Diego Geminez, Extension Specialist; George Tabb, Montgomery County Extension Agent; Kathleen Tajeu, Extension Food and Nutrition Specialist; Mazie Wilson, Multi County Agent.

The committee had a total of 11 members.  Three, including Duncan, the chair, were black, two were Hispanic and six were white.

three letters of recommendation were required.[2]  As the letters came into the HR office, they were date stamped and added to the candidate's files.  Dr. Drakeford received a total of five recommendation letters, but only four were seen by the committee.  His fifth letter was written by Dr. Warren McCord, the "Extension State Program Leader" and his direct supervisor.  This letter was received by a temporary secretary in the HR office and never dated or placed in Dr. Drakeford's file.  For a period of time the letter was misplaced, but was eventually located by Duncan after Dr. Drakeford brought it to her attention.  For reasons discussed below, Duncan decided not to add the letter to his file and the search committee reviewed his application with only four letters.

The ADRTP search committee's first meeting was on October 30, 2001.  They had received eight applications for the position and it was decided that they would send the three top candidates to Director Smith, along with a summary of each candidate's strengths and weaknesses.  Director Smith would make the ultimate decision.  At the first meeting the committee members signed a confidentiality agreement, reviewed the job requirements for the position,[3] and began discussing the applicants.  They immediately eliminated one applicant, a

---

[2]While three letters were the minimum required for a complete file, additional letters were accepted.  Some candidates had more than three letters in their application.

[3]The job requirements mirror those listed in the vacancy announcement.  After the October 30th meeting the committee members received an email laying out the skills required to perform the job.  The committee members were instructed to refer to the following skills while evaluating the candidates: (1) Communication, interpersonal, supervisory, and organizational skills; (2) Background developing, implementing, and evaluating educational programs; (3) Fundamental understanding of and appreciation for the outreach mission of a land grant university; (4) Demonstrated success working within an academic and/or business environment; (5) Demonstrated success in working in or with Cooperative Extension programs; (6) Record of successful activities for advancement opportunities for minorities and individuals from diverse ethnic and cultural backgrounds; (7) Experience in developing and managing complex budgets;

white male, who was deemed under qualified.  At the next meeting on November 6, 2001, the

committee selected four of the remaining seven applicants to go forward in the process and

complete structured interviews with the committee.  Of the four selected, three were white and

one was Pakistani-American.  Dr. Drakeford and two other applicants (both white) were not

selected to go forward.  The four finalists were interviewed in January 2002.  Each was asked to

prepare and give a seminar presentation.[4]  The presentation portion of the interviews was called

the "public presentation."  This means that interested members of the ACES community were

invited to attend and were free to submit comments on the candidates.  Each presentation was

attended by Director Smith, as well as other members of the ACES Administrative Team.[5]   The

presentation was followed by an afternoon of structured interviews[6] with search committee

members and then a personal interview and dinner with Director Smith.

---

(8) Knowledge of the history and philosophy of Cooperative Extension and awareness of the
contemporary issues facing Extension.

[4]The candidates could choose from the following topics:  "Sustaining and Growing
Cooperative Extension in a Time of Decreasing Resources and Visibility" (2) "Shaping a
Current Vision of Who/What the Alabama Cooperative Extension System Is" or (3) "The Role of
Cooperative Extension in the 21st Century."  Director Smith and all members of the
administrative team watched each candidate's presentation.

[5]The Administrative Team is made up of the upper tier of ACES administrators.  At the
time Plaintiff's cause accrued the team members included: Director Smith (white), Dr. Thomas
Elliott (CFO) (white),  Ms. Barbara Duncan (Associate Director of Human Resources) (black),
Dr. Chinella Henderson (Associate Director for Urban and Nontraditional Programs) (black),
and Dr. Virginia Caples (1870 Administrator) (black).  The ADRTP is also traditionally a
member of the Administrative Team, but that position was, of course, vacant during the time
period in question.

[6]Structured interviews are where each candidate is asked the same questions, with limited
follow up questions.  They are designed to promote a non-discriminatory search by providing
each candidate an equal opportunity to show how his or her skills fit the requirements for the
vacant position.

Once the interviews were completed the search committee recommended that only two[7] applicants should advance to the final stage of the process.  Those two were, Dr. Sam Fowler (white) and Dr. Latif Lighari (Pakistani-American).

It is at this point in the sequence of events that Plaintiff, who had learned by letter that he was not selected to interview, filed a formal complaint under the ACES Equal Employment Opportunity Program (hereinafter "EEO Program").  While this complaint was pending, ACES temporarily halted the ADRTP selection process.

**1.  Plaintiff's EEO Complaint and Hearing**

Dr. Drakeford's EEO complaint alleged that racial discrimination on the part of the search committee was the reason he was not interviewed for the ADRTP position.  A two day administrative hearing was conducted on April 19 and May 8, 2002.  Director Smith selected Janet Saunders (black) to serve as hearing officer.  At the time,  Saunders was the Executive Director of Auburn University's AA/EEO office.  On July 15, 2002,  Saunders issued her findings of fact, conclusions, and recommendations.  She found no evidence that racial discrimination had occurred, but did note that substantial procedural irregularities had occurred in the search process.  She noted the following procedural defects: less than a 30 day application period was allowed; the position announcement had a different closing date than the internet ads; internal applicants were not instructed to complete updated Applicant Data Forms.  Saunders made two recommendations.  She suggested that Dr. Drakeford should be allowed to update his Applicant Data Form and resubmit his application, including the letter from Dr. McCord, for the

---

[7]After evaluating the four finalists, the committee determined that a significant gap existed between the top two and the other two.  Because of this, they deviated from their initial plan of sending three candidates to Director Smith.

search committee to reconsider.  Alternatively, she recommended that the search committee simply give Dr. Drakeford a good faith interview.  Dr. Drakeford was not in favor of either option,[8] but instead requested that the search be vacated, and reopened with a new search committee.

### 2.  Post EEO Hearing Search

Director Smith decided not to follow either Saunders' recommendations or Dr. Drakeford's suggestion that the search start from scratch.  Instead, he opted to grant Dr. Drakeford an interview with a three member committee, made up of the members of the administrative team who had not been members of the previous search committee.  This second committee was comprised of Director Smith, Dr. Chinella Henderson, the Associate Director for Urban and New Nontraditional Programs, and Dr. Virginia Caples, the 1870 Administrator.  Both women are black.  Dr. Drakeford was asked to pick one of the same three topics the other candidates were given and prepare a presentation.  He chose "Sustaining and Growing Cooperative Extension in a Time of Decreasing Resources and Visibility," and on September 5, 2002, he was interviewed for the position.  In the morning he gave his presentation to Drs. Smith, Caples, and Henderson.  Unlike the previous four candidates, Dr. Drakeford's presentation was not opened to all interested parties.  Afterwards, he had lunch with the three administrative team members and then a private interview with Director Smith.  Following his interview, the whole administrative team was called together to deliberate and decide which candidate should fill the vacant ADRTP position.  Director Smith decided that the team would consider five candidates.  Along with Dr. Drakeford, the administrative team discussed the two

---

[8]He had several objections to the hearing process which are discussed <u>infra</u>.

candidates that the search committee initially recommended, Drs. Fowler and Lighari. Additionally, the other two candidates whom the search committee interviewed but did not recommend were considered.  For a variety of reasons discussed below, Director Smith decided to follow the consensus of the Administrative Team and hired Dr. Fowler for the ADRTP position.

**C.  Facts surrounding the AD4-H Position**

In December 2002, two months after the ADRTP position was filled, ACES announced that it was beginning a search for the vacant position of Assistant Director, 4-H and Youth Development (AD4-H).  Dr. Rebecca Dollman, who has worked at ACES in a variety of jobs for over thirty years,  was tapped to head the search committee.  In addition to Dr. Dollman, 12 other ACES employees were chosen to serve as members of the committee.[9]  Before the committee began it's work, Dr. Dollman and the heads of two other assistant director search committees met with a representative from the Auburn AA/EEO office for training on how to conduct a proper search.  At that meeting, Dr. Dollman and the other committee chairs created a uniform scoring and evaluation sheet to be used by the committee members when evaluating applicants for ACES assistant director positions.  The sheets listed different skill categories, and space for the committee member to assign points.  Pl.'s Ex. F.

Prior to the first committee meeting, the members received a package of materials that included: a confidentiality agreement, the position announcement and job analysis for the AD4-

---

[9]The members of the AD4-H search committee were as follows: Dr. Rebecca Dollman, Mr. Bob Ebert, Mr. Tom Futral, Ms. Betty Gottler, Dr. Molly Gregg, Dr. Janice Harper, Dr. Mary Hurt, Mr. Mario Lightfoote, Mr. Greg Parmer, Ms. O.J. Richardson, Ms. Sandra Spencer, Mr. Willie Williams, Dr. Rusty Wright.  Eight members were white and five members were black.

H position, a training booklet prepared by the ACES human resources department on how to conduct a job search, and the aforementioned score sheet the members would use to evaluate the applicants.  On April 4, 2003, the committee held its first meeting via video conference.  During the meeting, the forms they had been mailed and search procedures were discussed.  They set their next meeting for May 9 at the 4H Center in Shelby County.  The committee members were asked to evaluate the application packages and bring completed score sheets for each applicant to the May meeting.

At the meeting on May 9 the score sheets were totaled and each applicant received a composite score.  The scores established a clear hierarchy among the candidates.  The following are the applicants, their scores, and their race:

| | | |
|---|---|---|
| Dr. Dorothy Freeman | Score - 75 | Black |
| Dr. Paul Waddy | Score - 71 | Black |
| Dr. David Mitchell | Score - 70 | White |
| | | |
| Dr. Robert Drakeford | Score - 63 | Black |
| Dr. Lamar Nichols | Score - 61 | White |
| Dr. Tony Cook | Score - 61 | White |
| | | |
| Dr. Karen Gehrt | Score - 56 | White |
| Dr. Grace Kirkman | Score - 52 | Black |

The committee determined that since there was a "clean break" between the top three candidates and the next tier, they should only send the top three on to the interview phase.  The following Monday Dr. Dollman attempted to contact the three candidates to schedule interviews and learned that Dr. Freeman, the highest ranking applicant had accepted another job.  With their

top ranked candidate out of the picture the committee met again, via conference call, on May 13 to discuss out how to proceed.[10]  Eight of the committee members were present on the call, giving them a quorum.   The committee considered and rejected the option of re-opening the search and starting from scratch.  It was also decided that they would not interview only the top two remaining candidates.  Dr. Dollman pointed out that Director Smith had asked that three to four candidates be sent forward for him to consider.

The issue quickly became who should replace Dr. Freeman as a finalist.  Some members of the committee wanted to simply plug Dr. Drakeford into the vacant slot.  At 63 points he was the next highest ranked candidate, and with Dr. Freeman out of the picture he moved into the top three by default.  Other members of the committee felt that Dr. Drakeford should now be given an interview, but also wanted to interview Drs. Cook and Nichols.  They reasoned that there was not a "natural break" between Dr. Drakeford (63 points) and Drs. Cook and Nichols (both at 61 points), so each should be given a chance to interview so the committee could evaluate their strengths and weaknesses.  The committee chose the latter route, and voted four to two, with one abstention, to interview the remaining top five candidates.

At the end of the conference call committee member O.J. Richardson (black) resigned, stating that she believed the decision to interview the top five applicants was racially motivated. In a subsequent letter of resignation, Richardson explained that taking the top five candidates instead of the top three was done "to avoid possible selection of a qualified African-American candidate of which we have two."  Dollman Aff. Ex. I.  In Richardson's view, taking the top five

---

[10]Committee member Mario Lightfoote secretly recorded this meeting and the tape has been produced in discovery.

instead of the top three did nothing more than add two white candidates to the finalists, thereby decreasing the probability that a black candidate would eventually be selected for the position.

At the conclusion of the meeting,  Dr. Dollman decided to disregard the earlier vote and re-examine the issues once they had more committee members present for a discussion.  In addition to Ms. Richardson's resignation, another committee member had to leave in the middle of the meeting, dropping the meeting below the number needed for a quorum.   Dr. Dollman decided that it was best to have the full committee together to make sure everyone's opinion was heard on how to best proceed.

On May 16, ten of the original thirteen committee members were present for a meeting at the 4-H Center in Shelby, County.  After a discussion of how to proceed, discussed in detail below,  the committee again voted, this time seven to two,[11] to interview the top five candidates. They also discussed the format and time required to conduct the interviews, concluding that one day for each applicant would be sufficient.   The interview format was the same for each.   Each applicant would be asked to give a presentation on, "Your Vision for the 4-H Youth Development in Alabama."  The presentation would be followed by a structured interview, with the applicants being asked the same fourteen questions.  Additionally, each applicant was given the chance to have either breakfast or lunch with the committee on the day of their interview.

A short time after the May 16 meeting, Mr. Mario Lightfoote (black) resigned from the search committee.  At the time, Mr. Lightfoote's stated reason for resigning was that his plate was just "too full" with other projects that needed his immediate attention.  Dollman Aff. Ex. O.

---

[11]The minutes indicate ten members were present.  For reasons unspecified only nine voted.

Later, Mr. Lightfoote recanted this reason, and now insists that he resigned because he believed that the search committee's true motive in deciding to interview five candidates was to ensure that a white applicant was hired.  Mario Lightfoote Dep. at 86.

On June 20, Dr. Drakeford was the last of the group to interview with the committee members.  Following his interview, the committee gathered to discuss each candidate and select two or three to recommend to Director Smith for a final interview.  The discussion and evaluation was carried out in three phases.  First, each committee member was asked to rate the candidates on a 1 to 5 scale, with 1 as the highest ranking.   Dr. Drakeford's average score was 3.25 which placed him in third place among the five candidates.  Next, the committee evaluated each candidate solely on their presentation and response to the structured interview questions.  Plaintiff's score of 65.29 was significantly lower than the other four candidates who all scored in the 70's.  Finally, the committee voted whether each candidate was either acceptable or unacceptable, concluding that Drs. Nichols, Mitchell, and Waddy were acceptable, and Dr. Drakeford and Dr. Cook were unacceptable.

After the three phases of evaluation were complete the committee voted that it would be most appropriate to send three candidates forward.  The first two finalists were clear cut, as Drs. Mitchell and Nichols were ranked 1 and 2 respectively in both the initial "scale of 1 to 5 ranking" and the presentation/interview evaluation.  The third spot was more difficult.  Dr. Drakeford had been ranked one spot higher than Dr. Waddy on the scale ranking, but Dr. Waddy scored higher than him on the presentation/interview evaluation and had been given an "acceptable" rating by the committee.  By a 4 to 3 vote, with 1 member abstaining, the

committee named Dr. Waddy (also black) as the third finalist, thus eliminating Dr. Drakeford from the search.

The three finalists then gave public presentations and were interviewed by Director Smith.  After consulting with the Administrative Team, Director Smith hired Dr. Nichols as the new AD4-H Associate Director.

When he was not selected on July 20, 2003, as a finalist for the AD4-H position, Dr. Drakeford filed a new EEOC charge alleging racial discrimination and retaliation by ACES.  On May 28, 2004, the EEOC issued a determination letter, in which it found reason to believe that Dr. Drakeford had been discriminated against on the basis of his race, and that his non-selection for the AD4-H position could be construed as retaliation for his earlier EEOC charge concerning his non-selection as the ADRTP.  The Commission cited the fact that individual search committee members had destroyed their notes and score sheets,[12] as justification for an adverse inference of discrimination.  On March 18, 2005 the EEOC sent Plaintiff a "right to sue" letter.

## VI. DISCUSSION

Dr. Drakeford brings claims under Title VII, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981 (as enforced through § 1983) for racial discrimination,  and under Title VII for retaliation. Specifically, he makes the following claims: (1) he  was not promoted to the ADRTP position because of his race; (2) he was not promoted to the AD4-H position because of his race; (3) ACES deprived him of equal protection rights in violation of § 1983; (4)  Director Smith and President Walker deprived Plaintiff of certain guaranteed rights in violation of § 1983 and should

---

[12]The search committee members destroyed the notes they complied during the search and interview process.  The significance of this issue is discussed in detail infra.

be liable in their official capacities; (5) Director Smith and President Walker are also liable in their individual capacities for § 1983 violations; (6) the Defendants retaliated against him as to both positions.  He alleges that the interview he was given following his EEO hearing concerning the ADRTP search was a form of retaliation, and not being selected for the AD4-H position was retaliation.  Additionally, he argues that a written reprimand given to him by his supervisor Dr. Nichols and restrictions placed on his ability to teach undergraduate Political Science courses at Auburn University were both retaliatory actions.[13]   He does not assert Title VII claims against the individual Defendants.

## A.  Racial Discrimination Claims

The Plaintiff alleges that the Defendants violated Title VII and § 1983 by discriminating against him on the basis of his race.  Because the Plaintiff relies entirely upon circumstantial evidence to support his discrimination claims, the court's analysis will be guided by the three-step framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).[14]

Under the McDonnell Douglas analysis, the employee must first establish a prima facie case of discrimination.  Id. at 802.  If the Plaintiff is successful, the burden of production is

---

[13]At the pre-trial hearing it was agreed that the only separate "free standing" retaliation claims, in addition to the denials of promotion, were the written reprimand issued by Dr. Nichols and the restrictions on Plaintiff's ability to teach undergraduate courses.  Plaintiff contends that other actions taken by Defendant referred to in his amended complaint are admissible as evidence, and the court had fully considered all such evidence submitted.

[14]The same prima facie case and burden-shifting mechanisms apply to Title VII and Section 1981 discrimination claims.  See Cooper v. Southern Co., 390 F.3d 695, 724-25 (11th Cir. 2004).  Additionally, "[w]hen section 1983 is used as a parallel remedy for violation of section 703 of Title VII [42 U.S.C. § 2000E-2], the elements of the two causes of action are the same." Shuford v. Alabama State Bd. Of Educ., F. Supp. 1486, 1504 (M.D. Ala. 1997) (quoting Hardin v. Synchcomb, 691 F. 2d 1364, 1369 n.16 (11th cir. 1982).

placed upon the employer to articulate a legitimate non-discriminatory reason for its employment action. <u>Tex. Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 254 (1981). Once the employer satisfies its burden of production, the employee then has the burden of persuading the court that the proffered reason for the employment decision is a pretext for discrimination. <u>Burdine</u>, 450 U.S. at 256. The employee may satisfy this burden either directly, by persuading the court that a discriminatory reason more likely motivated the employer, or indirectly, by showing that the employer's proffered explanation is unworthy of belief. <u>Burdine</u>, 450 U.S. at 256; <u>Combs v. Plantation Patterns</u>, 106 F.3d 1519, 1528 (11th Cir. 1997). An employee's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated against the employee.[15] <u>See</u> <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 148 (2000).

**1. ADRTP Search and Selection**

In order to establish a prima facie case in a failure to promote claim, the plaintiff must prove the following four elements: (1) that he belongs to a protected class; (2) that he was qualified for a job for which the employer was seeking applicants; (3) that, despite his qualifications, he was rejected; and (4) that, after his rejection, the employer continued to seek applicants or filled the position with a person outside of the plaintiff's protected group. <u>See</u>

---

[15] "Although the defendant is entitled to summary judgment in its favor if the plaintiff does not proffer sufficient evidence of pretext, the converse is not necessarily true. If the plaintiff does proffer sufficient evidence that the defendant's stated reasons are pretextual, the plaintiff still may not be entitled to take his case to a jury." <u>Chapman v. AI Transport</u>, 229 F.3d 1012, 1025 n.11 (11th Cir. 2000) (en banc). Indeed, there may "be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." <u>Id.</u>

Walker v. Mortham, 158 F.3d 1177, 1186 (11th Cir. 1998); Williams v. Ala. Indus. Dev.

Training, 146 F. Supp. 2d 1214, 1219 (M.D. Ala. 2001).   The first, third, and fourth elements

are beyond dispute in this case, as Dr. Drakeford is a black man who was passed over for the

ADRTP position, while Dr. Fowler, a white applicant, was selected.  Defendants are also willing

to concede that Plaintiff meets the minimum qualifications for the ADRTP, and at the prima

facie stage of the case that is all Plaintiff is required to do.  Burney v. Rheem Mfg. Co., Inc., 196

F.R.D. 659, 670 (M.D. Ala. 2000) ("To establish [his] prima facie case, plaintiff need not show

that [he] was the most qualified person for the position—it is sufficient if [he] presents evidence

that [he] was minimally qualified.").

     Having determined that the Plaintiff met his initial burden of establishing a prima facie

case of race discrimination, the burden of production shifts to Defendants to articulate legitimate,

non-discriminatory reasons for the decision not to select Plaintiff as the new ADRTP.  See

Burdine, 450 U.S. at 254;  McDonnell Douglas, 411 U.S. at 802 (defendant's burden is

"exceedingly light" and is "one of production, not proof.").   Defendants met this burden by

producing admissible evidence sufficient for the trier of fact to conclude that Dr. Fowler was the

most qualified of the applicants for the ADRTP position.  They point out that Dr. Fowler

separated himself from the pack because he had extensive management experience at an

organizational level.  A review of Dr. Fowler's qualifications shows that he had significant

experience as an associate director within ACES, and of particular note, he spent two years as

the interim ADRTP.  Defendants felt that Plaintiff's experience was limited to the project or

program level and that he lacked the more comprehensive leadership and administrative

experience that the ADRTP position requires.  Defendants also say that Dr. Fowler's

presentation stood out and that he was impressive in his interviews.  He was able to present a

vision for the future development and implementation of programs at the organizational level.

Dr. Drakeford's presentation was criticized as "unorganized," "disjointed," and lacking

"comprehension of [the] big picture/vision."[16]  Accordingly, the burden shifts back to the

Plaintiff to "prove by a preponderance of the evidence that the legitimate reasons offered by the

defendant were not its true reasons, but were a pretext for discrimination."  Reeves, 530 U.S. at

143.

      In the materials presented to the court, Plaintiff does little, if anything, to counter

Defendant's proffered reasons. With respect to the relative qualifications of candidates,

"evidence showing that an employer hired a less qualified applicant over a plaintiff may be

probative of whether the employer's proffered reason for not promoting that plaintiff was

pretextual."  Lee v. GTE Florida, Inc., 226 F.3d 1249, 1253 (11th Cir. 2000).  The burden is on

the  plaintiff to establish that he or she was "substantially more qualified than the person

promoted."  Id. at 1255.  More specifically, "disparities in qualifications are not enough in and of

themselves to demonstrate discriminatory intent unless those disparities are so apparent as

virtually to jump off the page and slap you in the face."  Id., quoting Deines v. Tex. Dep't of

Protective and Regulatory Servs., 164 F.3d 277, 280 (5th Cir. 1999); see Damon v. Fleming

Supermarkets of Fla, Inc., 196 F.3d 1354, 1361 (11th Cir. 1999) (stating that federal courts "are

not in the business of adjudging whether employment decisions are prudent or fair.  Instead our

sole concern is whether unlawful discriminatory animus motivates a challenged employment

---

    [16]In support of these reasons, Defendants offered documentary evidence as well as the
affidavit and deposition testimony of the members of the Administrative Team and the Search
Committee charged with evaluating the ADRTP applicants.

decision.").  In his complaint and throughout his deposition testimony, Dr. Drakeford asserts that

he is more qualified than Dr. Fowler, but he offers no evidence to back up these claims.  It is

well known and long accepted that a Plaintiff "cannot prove pretext by asserting baldly that [he]

was better qualified than the person that received the position."  Wilson v. B/E Aerospace, Inc.,

376 F.3d 1079, 1088 (11th Cir. 2004), citing Alexander v. Fulton Co., Ga., 207 F.3d 1303, 1339

(11th Cir. 2000).  When dealing with summary judgement, "conclusory allegations without

specific supporting facts have no probative value."  U.S. v. Trainor, 376 F.3d 1325, 1334 n.5

(11th Cir. 2004), quoting Evers v. General Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985).  In

this case, Dr. Drakeford has failed to produce specific evidence to show that he was even as

qualified as Dr. Fowler, much less substantially more qualified.  No reasonable fact finder could

conclude from the evidence before the court that Dr. Drakeford was more qualified for the

ADRTP position than Dr. Fowler.

     Still addressing relative qualifications, Plaintiff argues that the ADRTP position was

really a "programming" position, and not an "administrative" position.  ACES defines

programming positions as those dealing with designing, developing, implementing, and

evaluating different educational programs and administrative positions as those dealing with

supervising employees and managing financial resources.  See James L. Smith Dep. at 60-61;

Samuel Fowler Dep. at  44.  Dr. Drakeford reasons that if the position was classified as a

programming position then he would be the more qualified candidate because his expertise is

programmatic, where the bulk of Dr. Fowler's experience has been administrative.  The fact

remains, however, the ADRTP was considered to be an administrative position.  ACES produced

a "job analysis" for each position that summarizes the job's responsibilities, and the ADRTP is

described as "an administrative position within the Alabama Cooperative Extension System."

Pl.'s Ex. 13.  The position announcement described the ADRTP as an administrative position.

Duncan Dep. Ex. B.  The job analysis called for someone who could provide a strategic vision

with expertise in the areas of staffing, budgeting, and leadership.  It was not unreasonable for the

search committee to want someone like Dr. Fowler, who has administrative experience at the

organizational level, to fill the ADRTP position.  The court does note, in referencing the job

analysis, that the ADRTP appears to be a hybrid because it calls for both administrative and

programming skills.  The court notes further, however, that in addition to an extensive

administrative background, Dr. Fowler also has wide ranging experience in several primarily

programmatic jobs.

Dr. Drakeford also argues that Dr. Fowler's experience as Associate Director for Field

Operations and Governmental Relations (ADFOGR) should not have been considered in the

selection process because Dr. Fowler had been removed from that position by a federal court

order.  In 1986 Dr. Fowler was named interim ADFOGR by then Director Dr. Ann Thompson.

He served in an interim capacity until 1990, when he was named permanent ADFOGR.  In 1992,

Judge Truman Hobbs found that Dr. Thompson had violated previous court imposed

desegregation orders by appointing Dr. Fowler as ADFOGR.  Strain v. Martin, No. 840-E, slip

op. at 15 (M.D. Ala. June 26, 1992).  Specifically, Dr. Thompson had appointed Dr. Fowler to

the position on an interim basis without giving other interested parties a chance to apply.  Id. at

9-10.  Once Dr. Fowler had been in the position for close to two years, Dr. Thompson solicited

applications, but eventually chose Dr. Fowler as the permanent ADFOGR.[17]  Id. at 10.  Dr.

Fowler was relieved of the position, but not because he had done anything wrong.  Dr. Fowler

was relieved  because Dr. Thompson had failed to give notice to others that the position was

open.  See id. at 15-16.  Dr. Drakeford contends that, since Dr. Fowler was relieved by the court,

it was an error for the search committee to consider the experience he gained as ADFOGR from

1986-1992.  He does not cite any legal reasons to support this argument, and the court is

unaware of any law that would forbid consideration of Dr. Fowler's tenure as interim and

permanent ADFOGR.  Even if the committee were to have discounted Dr. Fowler's supposedly

tainted stint as ADFOGR, however, he still served in other highly relevant associate director

positions where he gained extensive organizational leadership and management experience that

the committee sought.  For instance, Dr. Fowler returned as the ADFOGR in October, 1993 after

applying for and receiving the job through a competitive search process.  He served his second

stint as ADFOGR until the position was eliminated in 1995.  From 1995-97 he was the interim

ADRTP which is certainly relevant.  Even if  the court completely ignored Dr. Fowler's first

stint as ADFOGR, the evidence does not show that Dr. Drakeford was substantially more

qualified for the ADRTP job, and certainly not under this circuit's "slap you in the face"

standard.

     In Dr. Drakeford's final attempt to argue that he is more qualified than Dr. Fowler he

alleges that Dr. Fowler inflated his accomplishments on his Curriculum Vitae,  and that members

---

[17]Dr. Fowler's permanent appointment as ADFOGR triggered Title VII, 42 U.S.C. §
1983, and 42 U.S.C. § 1981 complaints against ACES by two black applicants who did not get
the job.  They alleged racial discrimination, but the court found for ACES.  Strain, No. 840-E at
38.  Coincidentally, ACES argued that Dr. Fowler was simply more qualified than the other
applicants and they were unable to establish pretext. Id. at 24.

of the search committee along with Director Smith knew the information presented was not correct. To support his claim, Dr. Drakeford cites the deposition of Dr. James Smith, who was the ACES Associate Director of Human Resources for several years. In his testimony Dr. Smith goes through Dr. Fowler's CV and takes issue with Dr. Fowler's level of involvement in several of the items Dr. Fowler listed as accomplishments. See Smith Dep. at 104-157. Because Dr. Smith would have had first hand knowledge, the court accepts that this testimony creates an issue of fact as to whether or not Dr. Fowler exaggerated his accomplishments, but Dr. Drakeford does not show that an issue of fact exists as to whether any member of the search committee or Director Smith believed Dr. Fowler's CV to be incorrect. See Elrod v. Sears, Roebuck and Co., 939 F.2d 1466, 1470 (11th Cir. 1991). Plaintiff's arguments that Dr. Elliot and Ms. Duncan, members of the search committee, and Director Smith were all in a position to know that Dr. Fowler's claims were inaccurate are pure speculation. Other than speculation and conjecture, there is nothing in the record which would indicate that any of the decision makers in the process believed that Dr. Fowler misrepresented his achievements on his CV. There is no need for the court to determine whether or not members of the search committee or Director Smith should have known about possible improprieties. The only inquiry is whether they believed Dr. Fowler had made false claims.  Gaddis v. Russell Corp., 242 F. Supp. 2d. 1123, 1148 (M.D. Ala. 2003) ("The reasonableness of the decision maker's belief is not at issue in employment suits, thus the question of whether an employer's honest belief has a basis in fact is not a proper question to be considered on summary judgment."). Without specific evidence of such belief, there can be no inference of discrimination drawn. See Trainor, 376 F.3d at 1334.

Plaintiff also argues that procedural irregularities in the search process are evidence of pretext and should preclude summary judgment.  He is incorrect.  It is true that "the bending of established rules *may*, of course, be suggestive of discrimination."  Walker v. Prudential Property and Cas. Ins. Co., 286 F3d 1270, 1279 (11th Cir. 2002) (emphasis added), citing Morrison v. Booth, 763 F.2d 1366, 1374 (11th Cir. 1985).  There is greater suspicion when "established rules were bent or broken to give a non-minority applicant an edge in the hiring process."  Carter v. Three Springs Residential Treatment, 132 F.3d 635, 644 (11th Cir. 1998), citing Morrison, 763 F.2d at 1373-74; see also Bass v. Bd. of County Comm'rs, 256 F3d. 1095, 1108 (11th Cir. 2001) (inference of discrimination appropriate when employer promoted an employee who was unqualified by employer's own published standards, while Plaintiff who was not hired did meet the minimum qualifications).  In our case, Plaintiff fails to grasp that for there to be an inference of discrimination he must show that the procedural irregularities had a negative impact on his application.  Plaintiff complains of numerous problems throughout the search and hiring process, but does not show how any of them would provide another non-minority candidate with an unfair advantage over him.

Plaintiff cites the EEO report filed by Janet Saunders as evidence of pretext.  In that report Ms. Saunders concluded that "irregularities in the search process are substantial."  She addressed Dr. Drakeford's complaints that correct search procedures were not followed and agreed that in several instances there were procedural errors.[18]  Plaintiff relies on Vessels v.

---

[18]It is worth noting that Ms. Saunders also concluded that several of Plaintiff's complaints about alleged procedural deviations were without merit.  For instance he argued that the search committee should have included someone who would report to the open position, but could provide no law, policy, or procedure to support his position.  Def.'s Ex. 15 at 7.  Plaintiff also complained that according to ACES policy he should have been granted an interview

<u>Atlanta Indep. Sch. Sys.</u>, 408 F.3d 763 (11th Cir. 2005), to bolster his argument for an inference of pretext, but this reliance is misplaced.  In <u>Vessels</u> an employee did not receive a promotion and alleged that he was not selected based on his race.  The court there held that the employer's disregard of its own procedures was one element among several that created an issue of fact on whether the employer's reasons were pretextual.  <u>Id.</u> at 772.  Unlike our case, the employer in <u>Vessels</u> appeared to bend its own rules specifically to give one applicant an unfair advantage.  <u>Id.</u> That employer had also made racially tinged statements and hired someone whose qualifications were clearly inferior to the Plaintiff's.  <u>Id.</u>  Our facts show only errors that appear to have had no impact on the hiring decision, and doubt about whether the Plaintiff was even as qualified as the person eventually selected.

The following review of these errors reveals no inference of racial animus: (1) Less than a 30 day application period was allowed.  This deviation affected all applicants equally, and at least one other applicant was rejected for sending his paperwork in after the deadline.  (2) The "hard copy" position vacancy announcements had a different closing date than the internet ad. Plaintiff, who went off the more open ended internet ad, initially had his application rejected as untimely.  This discrepancy applied to all potential applicants who received the notice, and because he was still allowed to apply after an appeal to the Director, had no effect on Plaintiff. (3) Internal applicants were not instructed to complete updated Applicant Data Forms.  This oversight applied to the group of applicants employed by ACES, a group made up of both black and white applicants, including the eventual selectee, Dr. Fowler.  Dr. Drakeford was given the chance to update his Data Form when he was eventually inteviewed for the job.

_____

because he was black, but again could provide no explicit policy to back up that contention. <u>Id.</u>

Plaintiff has also raised additional arguments that are best classified as procedural issues, but that apply only to him.  First, he argues that Ms. Duncan intentionally withheld a letter of recommendation for the him written by his immediate supervisor, Dr. Warren McCord, in order to place him at a disadvantage.  Defendants have countered that the letter was simply misplaced by an inexperienced temporary secretary assigned to the Human Resources office.  By the time the letter was located, the search committee had already begun deliberations. Plaintiff had more than the three required letters in his file, so Ms. Duncan decided that there was no need to forward Dr. McCord's letter to the committee.  Based on the facts presented, the most that Dr. Drakeford can hope to show is negligence on the part of Defendants, but not the discriminatory animus alleged.  He produces no evidence that would indicate that Ms. Duncan, a black woman, wanted to see him fail or that she withheld the letter to disadvantage him because of his race. Any supposed disadvantage suffered by the Dr. Drakeford [19] was mitigated when the letter from Dr. McCord was considered when Plaintiff was eventually granted an interview.

Plaintiff also argues that, contrary to ACES' "customary employment regulations," on two occasions he was denied access to different files by the Human Resources Department and that that equates to circumstantial evidence of pretext.  In the first instance, Dr. Drakeford attempted to access his personnel file but was told he would have to wait until Ms. Duncan had returned to the office.  He was allowed to see the file the next day when Ms. Duncan was present.  The personnel files were not considered by the ADRTP search committee and Plaintiff

---

[19] It is highly debatable whether Plaintiff suffered any disadvantage at all from the missing letter.  Ms. Duncan, who chaired the ADRTP search committee, points out that little weight is given to the letters, as normally one would not ask for a letter from someone who would give a negative reference.  See Duncan Dep. 90.   At the time the letter was located, Plaintiff already had four letters in the file before the search committee, one more than the three required letters.

does not allege that anything was amiss concerning his file.  The court cannot see how having to wait a day to view his personnel file is relevant, much less evidence of pretext.

Plaintiff was also denied immediate access to the ADRTP case file, which contains documents generated in the course of the search process.  When he asked, Ms. Duncan told him that it would be improper for anyone to see the case file while the search process was still on-going.  Dr. Drakeford complained to Ms. Saunders, and she allowed him to see the file a week later.  Again, it is difficult for the court to see how this delay in seeing the case file should lead to an inference of racial discrimination.  It is reasonable to understand why Ms. Duncan would want to keep the file sealed until the on-going search had concluded.  Plaintiff correctly points out that Chapter 19 of the ACES policies and procedures handbook states, "Case files will be available for review by all applicants and other persons who request to see the file."  What Plaintiff does not mention is that the handbook goes on to say, "...information that will affect the name and character of an employee or prospective employee will not be public information."  Because of the ambiguous nature of the policy, it is difficult to say whether the initial denial of the case file was even a procedural error.  Regardless, Plaintiff was eventually allowed to see the file, and he provides no evidence that the initial denial was racially motivated or that it injured him in any way.  As discussed, supra, speculation and guesswork simply have no place in a summary judgment determination.  Trainor, 376 F.3d at 1334 n.5.  Beyond his own speculation, Plaintiff  is unable to provide any evidence that the file was tampered with or that the delay in seeing it was designed to facilitate discriminatory intent.  See Drakeford Dep. 212.

Plaintiff has also complained that there were procedural errors in the conduct of the EEO hearing which would lead to an inference of discrimination.  First, he believes that it was an

error to appoint Ms. Janet Saunders as the hearing officer.  The Extension's own guidelines on

EEO procedures clearly leave the selection of any hearing officer to the discretion of the

Director.  Here, Director Smith chose Ms. Saunders, who was the Executive Director of the

Auburn University AA/EEO office.  She had extensive experience throughout her career dealing

with matters of racial discrimination in employment matters.  Dr. Drakeford's contentions that

the hearing officer should have been an Extension employee and that Ms. Saunders was

somehow biased are without merit.  He has argued that Ms. Saunders was effectively a rubber

stamp actually controlled by the Auburn University General Counsel, Lee Armstrong, but

produces no evidence to back up this claim.  The evidence before the court shows that Ms.

Saunders was a well qualified choice as hearing officer and acted as a neutral fact finder.

Plaintiff also argues that the hearing was flawed because he was denied the right to counsel at

the hearing.  The facts show otherwise.  Both sides were allowed to have counsel present during

the hearing, which is consistent with the ACES hearing policy, but while counsel could assist

during the hearing and make arguments, questioning was done solely by the parties.  Dr.

Drakeford was given the opportunity to call and cross examine witnesses under oath and his

counterpart, Ms. Duncan, was given the same opportunity.  His lawyer was present and a review

of the transcript shows that he participated and was able to lend assistance to Plaintiff throughout

the proceeding.   Plaintiff is also unable to show how he was disadvantaged, or how anything

that happened during his hearing was motivated by racial animus.

    Dr. Drakeford's final argument concerning the ADRTP position concerns the interview

that he was given following his EEO hearing.  Plaintiff claims that the interview was a "sham"

and that members of the special committee put together to evaluate him for the position were

somehow coerced into following Director Smith's example and voting against him.  In what unfortunately has become a recurring theme in this opinion, Plaintiff is unable to support his complaint with evidence beyond his own speculation.

Plaintiff contends that the interview he eventually received was really a "sham" or, more accurately,  pretext to shield discrimination in the ADRTP hiring process.  Once the EEO hearing findings were released, Dr. Drakeford believed that the search committee should have been disbanded and a new search should have been conducted.  He argues that the interview he received was pretextual because it was with different members of the administrative team than the others who were interviewed and materially different in procedure.  Because the Plaintiff has established a prima facie case of discrimination, the burden of production shifts to the Defendants to articulate a legitimate, non-discriminatory reason for the challenged employment action.  McDonnell Douglas, 411 U.S. at 802-03.  As in the ultimate decision to hire Dr. Fowler discussed supra, Defendants are able to offer legitimate, non-discriminatory reasons for giving Plaintiff an interview with Drs. Henderson, Caples, and Smith, rather than vacating the search or allowing Dr. Drakeford to interview with the current search committee.  In her findings and conclusions, Ms. Saunders recommended that in the interest of fairness, Dr. Drakeford ought to be granted the chance to interview for the position.  Although he was under no obligation to accept Ms. Saunders' recommendation, Director Smith decided to interview Dr. Drakeford but had problems deciding how to go about it.  He decided not to grant Plaintiff's wish and  vacate the search.  The search committee had put significant time and effort into a review of the candidates, and the Director believed it would be insulting to the committee members to discard their work.  He was also concerned about future search committees.  He reasoned that it would

30

be difficult to find employees willing to serve on subsequent committees if he discarded the work of this one, particularly when the EEO hearing had revealed no evidence of discrimination. He also felt that it would be inappropriate to send Dr. Drakeford back to the very same search committee that had previously determined he was not acceptable for the position.  His solution was to have Dr. Drakeford interview with the members of the administrative team who had not been members of the search committee.  Once the decision was made to interview Dr. Drakeford, it is hard to argue with the Director's logic, and the reasons offered are legitimate and non-discriminatory.   Defendants have met their burden of production, so it is up to Plaintiff to produce evidence of pretext.  Id.   Plaintiff is unable to meet this burden.  After labeling the interview a sham designed to mask discrimination, he offers no evidence to back that claim up. Plaintiff sets forth no proof that the opportunity to interview was anything other than the Defendant's good faith effort to mitigate the procedural irregularities noted by Ms. Saunders.  He is unable to show that Director Smith was motivated by discriminatory animus when he granted Dr. Drakeford an interview,  nor has he shown that the interview itself was discriminatory. Plaintiff's allegations that the format of the interview was discriminatory are baseless.  Plaintiff contends that his interview was materially different from the procedure followed for the other candidates and therefore discriminatory.  The facts show only that Plaintiff was given an ample opportunity to present his qualifications to three members of the administrative team, including the ultimate decision maker, Director Smith.  Drs. Henderson and Caples, who are both black, witnessed the presentations of all of the candidates and had access to the application materials as well as the search committee's conclusions and were in a position to compare Dr. Drakeford to the other candidates.  Plaintiff's claims that Drs. Henderson and Caples would be unwilling to

31

support him because they did not want to draw negative attention from Director Smith have no basis in supporting evidence.  The court fails to see how the decision to interview Dr. Drakeford or the  interview itself could be considered a pretext for racial discrimination.

The Plaintiff having failed to submit sufficient evidence from which a reasonable jury could conclude that the Defendants' legitimate non-discriminatory reasons given for not promoting him to the ADRTP position was pretextual and that the real reason was racial discrimination, summary judgment is due to be granted on this claim.

**2. AD4-H Search and Selection**

Plaintiff's second claim of racial discrimination is that he was not promoted to the AD4-H position because he is black.  Because Plaintiff only presents circumstantial evidence of discrimination, this claim, like his ADRTP failure to promote claim, is analyzed under the McDonnell Douglas framework.  See McDonnell Douglas, 411 U.S. at 792.

As with the ADRTP position, Plaintiff can satisfy the following four elements required to establish a prima facie case of racial discrimination: (1)  Plaintiff belongs to a protected class; (2) he had the minimum qualifications required for the AD4-H position; (3) despite his qualifications he was rejected; and (4) after Plaintiff was rejected, ACES filled the position with a white male, Dr. Lamar Nichols.  See Walker, 158 F.3d at 1186, citing McDonnell Douglas, 411 U.S. at 802.

With Plaintiff's prima facie case made, the burden of production shifts to Defendants to articulate a legitimate, non-discriminatory reason for why Dr. Nichols was hired.  See Burdine, 450 U.S. at 254;  McDonnell Douglas, 411 U.S. at 802.

32

Defendants assert the following reasons for their decision to hire Dr. Nichols and not Dr. Drakeford for the AD4-H position: that Dr. Drakeford did not perform as well in the interview as other candidates and that, based on his prior experience, Dr. Nichols was the most qualified of all the candidates.  Once the search committee decided to interview five candidates, Dr. Nichols stood out with a strong interview and presentation.  There was no doubt among the committee members about whether or not to send him forward to interview with Director Smith.  After the interviews and presentations, the committee ranked Dr. Nichols as the number two candidate behind Dr. Mitchell.  Dr. Drakeford, on the other hand, did not impress the committee members with his presentation or interview.  One committee member felt that Dr. Drakeford lacked vision, while Dr. Nichols not only had a vision, but a well crafted strategy and marketing skill to achieve that vision.  Betty Gottler Dep. at 93 and 137.  In comparing Dr. Nichols' interview to Dr. Drakeford's, another committee member commented that Dr. Nichols' answers and delivery were simply more impressive.  Mary Gregg at Dep. 46.  Defendants point out that Dr. Nichols was more experienced in similar leadership positions than Dr. Drakeford or any of the other candidates.  For instance,  he had actually served as an Assistant Director for 4-H in another state, and also had experience as a district agent.  In contrast, Dr. Drakeford had never worked above the role of specialist at any extension.

Having satisfied the exceedingly light burden of production, Defendants have eliminated the presumption of discrimination, and the Plaintiff has the burden of proving that the reasons offered by the Defendants are merely a pretext for discrimination.  McDonnell Douglas, 411 U.S. at 802.  Plaintiff is unable to provide sufficient evidence that Defendants' reasons are pretextual, and is therefore unable to preclude summary judgment on this claim.

33

Dr. Drakeford first attacks the hiring of Dr. Nichols head on stating that, "there is no serious basis for considering Nichols to be better qualified than [Drakeford] for this position." Pl.'s Opposition Br. at 24.  As discussed regarding the ADRTP position above, the hiring of a less qualified person can be probative of discriminatory animus, but it is incumbent upon Plaintiff to show that he was "substantially more qualified than the person promoted." Lee, 226 F.3d at 1255.  The relevant inquiry is not who is more qualified, but whether the magnitude of any disparity in qualifications is so great that a reasonable fact finder could infer discriminatory intent. Cofield v. Goldkist, 267 F.3d 1264, 1268 (11th Cir. 2001).  Indeed, this is a weighty burden for Plaintiff to carry.  He must produce evidence "that the disparity in qualifications is so apparent as virtually to jump off the page and slap you in the face." Id. at 1268; Alexander, 207 F.3d at 1340; Lee, 226 F.3d at 1254, all citing Dienes, 164 F.3d at 280.

Dr. Drakeford offers no credible argument that he is more qualified than Dr. Nichols, but instead criticizes Defendants for placing too much emphasis on Dr. Nichols' previous experience as an assistant director in the Wyoming Extension System and as a district agent in the Tennessee Extension System.  Dr. Drakeford contends that, since Wyoming is sparsely populated, the prestige and responsibility of an assistant directorship is diminished.  He makes a similar argument about Dr. Nichols' experience as a district agent in Tennessee, claiming that a district position there would be on the same level of prestige as that of an Extension Specialist in Alabama.  Essentially, his argument is that Dr. Nichols was really just a glorified Extension Specialist,  and therefore no more qualified than he.  This claim may or may not be true,[20] but

---

[20]Dr. Drakeford never provides evidence, such as job descriptions or statistical data to back up his claims that Dr. Nichols' positions in Wyoming and Tennessee were overrated.

even if it were true, Dr. Drakeford still has not met the legal standard required to find pretext. Cofield, 267 F.3d at 1268.  He may actually have been as qualified as Dr. Nichols for the AD4-H position, but he never argues that his qualifications were so superior as to allow a reasonable fact finder to conclude that Defendants' justifications for hiring Dr. Nichols were pretextual.  Thus, this court cannot conclude that Defendants' proffered reasons for not promoting Plaintiff were pretextual for that reason.

Plaintiff also alleges that racial discrimination towards him occurred during the search process to fill the AD4-H position and, that that should allow him to avoid summary judgment.

Plaintiff argues that he is entitled to an adverse inference that would preclude summary judgement  because members of the AD4-H search committee destroyed the notes they took during committee meetings.   The adverse inference sought to be drawn from the destruction of the notes is that racial discrimination occurred during the search to fill the position of AD4-H, and that this would be the basis for a finding that the Defendants' proffered reasons for the challenged decision were pretextual.

"[A]n adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith."  Bashir v. Amtrak, 119 F.3d 929, 931 (11th Cir. 1997), citing Vick v. Texas Employment Comm'n, 514 F.2d 734, 737 (5th Cir. 1975).[21] "The adverse inference to be drawn from destruction of records is predicated on bad conduct of the defendant. 'Moreover, the circumstance of the act must manifest bad faith.  Mere negligence is not enough, for it does not sustain an inference of consciousness of a weak case.'" Vick, 514

_____

[21]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit issued prior to October 1, 1981.

F.2d at 737 (citation omitted).  Thus, under the "adverse inference rule," this court may not infer discriminatory animus on the part of the Defendants unless the facts and circumstances surrounding the destruction of the notes indicates bad faith on the part of the committee members.

The instant case is distinguishable from the case relied upon by Plaintiff,  Stanton v. National Railroad Passenger Corp., 849 F.Supp. 1524 (M.D. Ala. 1994).  That was a tort case concerning the collision of a train with a truck, where the central issue was the speed the train was traveling at the time of the accident.  Id. at 1525.  That Plaintiff had argued that the computer tape indicating the speed of the train had been intentionally destroyed by the Defendant train company, entitling him to an inference that the train was speeding when the accident occurred. Id. at 1528.  The Defendant in Stanton was unable to provide an explanation for why the tape was destroyed, so the Court found that a question of genuine fact existed as to the motivation behind the Defendant's destruction of the tape.  Id.

In contrast, Defendants in this case are able to provide a valid reason for why the notes were destroyed, namely to protect the confidentiality of the search process.   Defendants argue that confidentiality was of the upmost importance, because the committee members were being asked to evaluate their own colleagues and, if they believed that one day an unsuccessful candidate might find out what was being said,  the members would not be as candid when discussing particular strengths and weaknesses.  In deposition testimony, some committee members indicated that it was a standard practice at ACES for search committees to dispose of their notes once they had finished their work.  See Dollman  Dep. at  98; Mary Hurt  Dep. at 13 ("[I] have served on many committees and because of confidentiality, records being stolen and

things of that nature, I have nearly always shredded the records.").  Others indicate that they destroyed their notes to protect the confidential nature of the proceedings.  Janice Harper  Dep. at 21 ("I wouldn't want to keep anybody's personal information around so someone could just, you know, get ahold of them, so I destroyed them."); Rusty Wright  Dep. at 14 ("[Dr. Dollman] told us that all materials were confidential.  So I took that to mean once we were done to dispose and destroy them.").  Only one member recalls being told to destroy his notes, and as he remembers it, Dr. Dollman told him the reason was to maintain the confidentiality of the process.  Tom Futral  Dep. at 8.

Plaintiff places great weight on the fact that Dr. Dollman cautioned committee members that "all records are discoverable" meaning that notes could end up as public record in potential litigation.  Plaintiff theorizes that this indicates a desire to cover up discrimination, but that interpretation seems to take the statement out of context.  Dr. Dollman does not deny making the statement, but she made it while discussing the need to keep the proceedings confidential.  The statement was made shortly after the members were asked to sign confidentiality agreements which indicates that any reference to litigation was done only to emphasize the need to keep the search confidential.  None of the evidence before the court indicates that committee members destroyed their notes to prevent evidence of discrimination from coming to light in potential court proceedings.  All of the evidence points to committee members destroying their notes in the good faith belief that doing so would ensure the confidentiality of the search. Because the facts and circumstances do not indicate bad faith on the part of Defendants, the committee members' decision to destroy their notes does not trigger an inference of discrimination, and summary judgment is not precluded.

In addition to the evidence that confidentiality was the true motive behind the destruction of the notes, there is nothing before the court to indicate that anything improper happened while the committee was meeting.  There is no indication that the minutes of the meetings are incorrect. Dr. Drakeford contends that the remaining minutes are Dr. Dollman's sanitized version of events.  In fact, each member of the committee was given the opportunity to correct the minutes of previous meetings and ensure they were accurate.  Practically all members of the committee were deposed, and no one has indicated that the minutes are incorrect, or that a "smoking gun" of discriminatory intent was destroyed along with someone's notes.

Dr. Drakeford also alleges that the resignation of two black committee members, who claim racial discrimination was behind certain key decisions,  is highly probative of racial discrimination within the committee.  Needless to say, mere claims of discrimination do not mean that actual discrimination was occurring.  Here, the facts do not support claims of discrimination within the AD4-H search committee.

It is notable that the issues that led to resignations by O.J. Richardson and Mario Lightfoote would never have arisen had Dr. Freeman not found another job and withdrawn her name from consideration.  Ms. Richardson and Mr. Lightfoote claim that after Dr. Freeman withdrew, the committee decided to interview five candidates rather than three in order to increase the chances that a white candidate would be selected.  If Ms. Richardson and Mr. Lightfoote had had their way, once Dr. Freeman withdrew, the committee would simply have sent Dr. Drakeford's name in her place because his scores placed him fourth among all of the candidates.  What this court finds very significant is the fact that this supposedly racially-biased committee initially selected two black candidates (Dr. Freeman and Dr. Waddy) and one white

candidate (Dr. Mitchell) to go forward.  Additionally, the two black candidates,  Drs. Freeman and Waddy,  were ranked number one and two respectfully.  This hardly appears to be the behavior of a group attempting to tip the scales in favor of a white candidate.

Neither Ms. Richardson nor Mr. Lightfoote provide any substantive reasons to back up their claims of racial discrimination.  They were both in favor of interviewing only three candidates and were upset when the rest of the committee did not agree.  In their respective depositions, neither points to anything done or said by a committee member which would justify a conclusion that discrimination was at work.  Essentially the only evidence presented to the court are the subjective beliefs of Ms. Richardson and Mr. Lightfoote that something was wrong.[22]  Leigh, 212 F.3d 1217 ( "conclusory allegations without supporting facts have no probative value.").   Both ignore the fact that the committee's initial inclination was to do precisely what Richardson and Lightfoote wanted, which was to send two black candidates and one white candidate to interview.   Without some tangible evidence to indicate otherwise, it is irrational to think that the same committee would over the course of a week's time suddenly morph into a body intent on ensuring that a white candidate was selected by any means.

Defendants also offer a legitimate, non-discriminatory reason for wanting to interview five candidates and not three.  The majority of the committee believed that their initial ranking of the candidates had created a "natural break" where Dr. Drakeford fell into the second tier along

---

[22]Mr. Lightfoote first said that he did not have any idea whether other committee members were motivated by racism, because he could not "speak for them."  Lightfoote Dep. at 64.  He theorized that they were talking about matters outside of the meetings, but when asked if he knew this to be true stated, "I'm speculating."  Id..  Ms. Richardson never elaborated on why she believed discrimination had occurred, stating only that she believed the decision to interview five candidates was done to "avoid hiring a qualified African-American candidate."  Richardson Dep. at  26.

with Drs. Nichols and Cook.  In essence, the committee members concluded that it would be

unfair to Drs. Nichols and Cook to simply elevate Dr. Drakeford to the upper tier of candidates,

because the three men were only separated by two points.  Interviewing the three second tier

candidates would give them an equal chance to "break out" of the pack and advance in the

process.  Mr. Willie Williams (black) Dep. at 18 ("If I was sitting in a position where I was two

points less, I would like to be considered to interview to show what I can do."); Dr. Janice

Harper (also black) Aff. at 6 ("I wanted to make the choice based on more than rankings.  I

wanted to give the candidates a choice to present themselves, and then to pick the best three.").

Beyond the unsubstantiated suspicions of Ms. Richardson and Mr. Lightfoote, Plaintiff offers

nothing to suggest that Defendant's reasons are pretextual.  The court does note, however, that

both of these former committee members have themselves expressly given a racially motivated

reason for their resignations, i.e., the failure of the committee to accept their wishes which they

felt would have increased the chances of a black candidate ultimately being selected.

Finally, Plaintiff argues that summary judgment should be denied because the EEOC

found reasonable cause to believe that the denial of the AD4-H promotion was due to

discrimination and retaliation.  "Congress created the [EEOC] to investigate claims of

discrimination, to institute civil actions against employers or unions, and to settle disputes

through reconciliation before permitting a party to file a lawsuit.  Nevertheless, final

responsibility for enforcement of the federal employment discrimination laws is vested in the

federal courts."  Walker v. NationsBank of Fla., N.A., 53 F.3d 1548, 1554 (11th Cir. 1995), citing

Alexander v. Gardner-Denver Co., 415 U.S. 36, 44 (1974).  In the summary judgment context,

"when the independent facts before the district court judge fail to establish a genuine issue of

material fact, a favorable EEOC letter of determination does not create one." <u>Simms v.</u>

<u>Oklahoma ex rel. Dep't of Mental Health</u>, 165 F.3d 1321, 1331 (10th Cir. 1999).  In this case, the

litigation process has produced thousands of pages of testimony, affidavits, and documentation

which enables the court to make a fair determination on the claims presented.  The evidence

submitted to the court pertinent to the AD4-H search and selection is contrary to the conclusion

reached by the EEOC, and that evidence is what this court relies on in rendering judgment.

Furthermore, the EEOC determination was based on an evidentiary inference which the court has

held to be unjustified.  The EEOC letter does not preclude summary judgment on the AD4-H

claim.

Therefore, for the reasons stated, the Defendants are entitled to summary judgment on

this claim.

**B.  Retaliation claims**

Plaintiff complains that ACES retaliated against him for filing complaints with its EEO

office and with the EEOC concerning alleged discrimination towards him at ACES, in violation

of Title VII.  <u>See</u>  42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an

employer to discriminate against any of his employees . . . because he has opposed any practice

made an unlawful employment practice by this subchapter, or because he has made a charge,

testified, assisted, or participated in any manner in an investigation, proceeding, or hearing.").

To establish a prima facie case of retaliation under Title VII, the Plaintiff must establish

the following elements: (1) that he engaged in statutorily protected expression; (2) that his

employer was aware of that activity; (3) that he suffered an adverse employment action; and (4)

the existence of a causal connection between the protected activity and the adverse action.

Maniccia v. Brown, 171 F.3d 1364, 1369 (11th Cir. 1999).  Once the plaintiff makes out a prima

facie case of retaliation, the burden shifts to the defendant to produce legitimate, non-retaliatory

reasons for the adverse employment action.  Brochu v. City of Rivera Beach, 304 F.3d 1144,

1155 (11th Cir. 2002).   If the defendant meets this burden of production, the plaintiff has a final

opportunity to prove that the defendant's proffered reasons are a pretext for retaliation.  Id.

Title VII contains two related, yet distinct anti-retaliation prohibitions.  The

"participation clause" protects against discrimination when the employee "has made a charge,

testified, assisted, or participated in any manner in an investigation, proceeding, or hearing

under" Title VII.  42 U.S.C. § 2000e-3(a).  It protects employees from retaliatory actions that

occur in conjunction with or after the filing of a formal charge with the EEOC.  See E.E.O.C. v.

Total Sys. Servs., Inc., 221 F.3d 1171, 1174 (11th Cir. 2000).   Conversely, the "opposition

clause" protects an employee who merely has "opposed any practice made an unlawful

employment practice" under Title VII. Id.  In order to properly analyze the first element of the

Plaintiff's prima facie case, the court must first determine whether the Plaintiff engaged in any

activity protected by either clause.

Plaintiff filed his first  EEOC complaint on May 1, 2002, thus his protection against

retaliation under the participation clause began on this date.  All of the actions that he alleges

were retaliatory occurred after this date, so the court can safely conclude that Plaintiff can meet

the first element of his prima facie case on all of his retaliation claims.  Defendants do not

contest that Plaintiff engaged in protected activity.

### 1. Non-Selection as the ADRTP and as the AD4-H as Retaliation

In his amended complaint, Plaintiff contends that his post EEO hearing interview for the ADRTP position and subsequent non-selection were forms of retaliation for his prior EEO complaints concerning racial discrimination at ACES.  Pl.'s Am. Compl. ¶ 13.   As discussed extensively above, Defendants have offered legitimate, non-discriminatory reasons for both the type of interview Dr. Drakeford received, as well as the decision to hire Dr. Fowler for the position.  Plaintiff has been unsuccessful in his attempts to show that those reasons are mere pretext for discrimination, and he is equally unsuccessful at showing that the proffered reasons were a pretext designed to cover retaliation.  Actually, after arguably raising this as a separate claim in his complaint, Plaintiff failed to address it at all in his reply brief and accordingly, any such claim is abandoned and Defendants are entitled to summary judgment.  See Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp., 10 F. 3d 1563, 1568 (11th Cir. 1994) (The district court "could properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment.").

Unlike the ADRTP retaliation charge, Plaintiff does address the AD4-H retaliation charge in his reply brief.  Pl's Reply Br. at 15.  He argues that the members of the search committee were aware of his previous complaints, and that thus he has met the prima facie requirement that the decision makers were aware of the protected activity before they took adverse action. See Farley v. Nationwide Mut. Ins., 197 F.3d 1322, 1377 (11th Cir. 1999).  It is a close call whether Plaintiff meets the prima facie requirements, but the court need not decide that issue.  Even assuming that he did have a prima facie case of retaliation, for the same reasons discussed in regard to the race discrimination claim, Plaintiff has failed to carry the burden of

showing that a genuine issue of fact exists as to whether Defendants' proffered reasons for not hiring him were a pretext for retaliation.

### 2. Written Reprimand as Retaliation

On June 2, 2005, Plaintiff received a written reprimand for failing to attend a mandatory meeting, and for failing to contact his supervisor, Dr. Nichols, to obtain permission to be absent. Def.'s Ex. 44.  The Complaint was not amended to include this as a claim, and in his brief, the Plaintiff stated that he "does not wish to have that issue tried in this case . . . because he intends to take independent action on this disciplinary act, either under Title VII or the FMLA or both." Plaintiff's Brief, p. 19.  Defendants responded that, because of that, Plaintiff had abandoned the claim.  Defendants' Reply Brief, p. 6.  Even though at pretrial counsel for both sides opined that the matter could be decided on the basis of the evidence before the court, neither side asked to be allowed to brief it and neither have they sought to submit additional evidence.  The court finds that a retaliation claim based on this reprimand is outside the scope of the pleadings and is not properly before the court in this case.  Therefore, the holding in this case is not directed to any such claim.

### 3.  Interference with Teaching Opportunities as Retaliation

During his time at ACES, Dr. Drakeford has periodically taught undergraduate classes in the Political Science Department at Auburn.  He alleges that Defendants have forced him to overcome  unnecessary administrative obstacles to teach and that money given to ACES by the Political Science Department as compensation for Plaintiff's teaching was diverted away from his program accounts.

Plaintiff fails to establish a prima facie case of retaliation because the behavior he complains about does not rise to the level of an adverse employment action.

It is notable that Dr. Drakeford is complaining about what is essentially an extracurricular activity. Teaching Political Science is not what he is employed to do at ACES. Defendants point out that teaching outside of ACES is generally viewed as a positive, as long as it does not interfere with Dr. Drakeford's primary responsibilities as an extension specialist. Smith Dep. at 54. It makes sense to the court that Defendants would want to assert some positive control over what really amounts to a privilege, rather than a job entitlement. The issue becomes whether such controls amount to an adverse employment action and the answer is no.

To qualify as an adverse action, "an employee must show a *serious and material* change in the terms, conditions, or privileges of employment. Davis, 245 F.3d at 1239 (emphasis in original). "A materially adverse employment action 'must be more than a mere inconvenience or an alteration of job responsibilities.'" Greer v. Marco Warehousing, 179 F. Supp. 2d 1332, 1341 (M.D. Ala. 2001), quoting Crady v. Liberty Nat'l Bank & Trust, 993 F.2d 132, 136 (7th Cir. 1993). In order to teach Political Science classes, Defendants have asked Plaintiff to submit a written request to his supervisor at least six weeks before the start of the course. Defendants justify this requirement as a way to ensure that so called, "Smith-Lever funds"[23] are not used for non-extension activities, such as teaching undergraduate courses at the University. Director Smith informed Dr. Drakeford that each request will be taken on a case by case basis, and, as of yet, Dr. Drakeford has never been denied the chance to teach. Having to ask permission to

---

[23]The Smith Lever Act established the Cooperative Extension Service and provides federal funds for Extension activities. See Smith Dep. at 46-7.

perform a function that falls outside of Plaintiff's job scope has little if any impact on Plaintiff's job responsibilities, pay, or benefits and is not an adverse employment action.

Plaintiff also complains that Defendants withheld funds paid to ACES by the Department of Political Science.  As the court understands it, when Dr. Drakeford would teach a class the Department of Political Science would route $4000 to an ACES general account, and that money would then be turned over to Plaintiff's own program accounts for him to manage.[24]  Claiming that Dr. Drakeford failed to obtain advance permission to teach, Director Smith refused to make funds paid to ACES by the Department of Political Science available to Dr. Drakeford for his exclusive use.  Again, this is not an adverse employment action.  These funds, payable to ACES and not Plaintiff,  are not a part of Plaintiff's salary and thus have no impact on his income. While Plaintiff argues that he did obtain advance permission and the funds should not have been withheld, he never offers any evidence that his day to day job responsibilities as a specialist were affected by Defendants' actions.  It appears that whether Plaintiff is allowed to teach or not has no tangible impact on his function as an extension specialist.   Defendants are entitled to summary judgment on this claim.

## C.  Other Defenses

Since summary judgment is due to be granted on the merits as to all claims, there is no need for the court to discuss the asserted affirmative defenses of 11th Amendment immunity and qualified immunity, or the application of claims as to separate Defendants.

---

[24]It is unclear from the materials before the court whether this money was to be used to hire graduate students to assist Plaintiff in his teaching duties, or whether Plaintiff had the ability to put the money towards whatever program he felt needed it the most.

## V. **CONCLUSION**

Dr. Drakeford clearly considers himself to be better qualified for the positions in question than the white applicants who were selected, and concludes that race must be the reason that he lost out.  The evidence, however, supports neither his contention that he was the more qualified nor his conclusion that his not being chosen was the result of intentional racial discrimination or retaliation.  The evidence before the court, as discussed above, shows meaningful participation by conscientious participants of both races in the decision-making process, sound non-discriminatory reasons for their actions, and no evidence from which any reasonable jury could conclude that these reasons were a pretext for racial discrimination or retaliation.

The Defendants' Motion for Summary Judgment (Doc. #49) is hereby ORDERED GRANTED as to all claims.  A separate Judgment will be entered accordingly.

DONE this 6th day of February, 2006.


/s/ W. Harold Albritton
W. HAROLD ALBRITTON
SENIOR UNITED STATES DISTRICT JUDGE